Scott, C. J.
The question presented by this case is as to the constitutionality and vaildity of the act of the general assembly of this State, passed March 4, 1869, entitled “An act relating to cities of the first class having a population exceeding one hundred and fifty thousand inhabitants.”
The general scope and purpose of the act is to authorize any such city to construct a line of railroad leading therefrom to any other terminus in the State or in any other-State, through the agency of a board of trustees consisting of five persons, to be appointed by the superior court of such city, or if there be no superior court, then by the court of common pleas of the county in which such city is situated. The enterprise cannot, however, be undertaken until a majority of the city council shall, by resolution, have declared such line of railway to be essential to the interests of the city, nor until it shall have received the sanction of a majority vote of the electors of the city, at a special election, to be ordered by the city council, after twenty days’ public notice.
Eor the accomplishment of this purpose, the board of trustees is authorized to borrow a sum not exceeding ten millions of dollars, and to issue bonds therefor in the name of the city, which shall be secured by a mortgage on the line of railway and its net income, and by the pledge of the *40 faith of the city, and a tax to be annually levied by the council, sufficient with such net income to pay the interest and provide a sinking fund for the final redemption of the bonds.
In pursuance of the authority which this act purports to give, the city council of Cincinnati has resolved, that it is essential to the interests of that city that a line of railway, to be named “ The Cincinnati Southern Railway,” shall be provided between the said city of Cincinnati and the city of Chattanooga, in the State of Tennessee ; and this action of the council has been endorsed and approved by a vote of more than ten to one of the electors of the city, at an election duly ordered and held pursuant to the requirements of the act. But, fifteen hundred of the electors of the city voted against the proposed project; and the grave question here presented, on behalf of these unwilling electors and tax payers, is whether it is within the power of the State legislature to authorize the taxation of their property by the municipality for the purpose of constructing such a line of railway, by the means and in the manner prescribed in this act.
The consequences which may reasonably be expected to result from the exercise, by municipal corporations, of powers such as this act purports to confer, both in respect to public and private interests, are so momentous as to make it difficult to overestimate the importance of the question ; and to demand at our hands the most careful investigation and deliberate consideration. This is the first instance, in the history of the State, so far as we are aAvare, in which the general assembly has undertaken to authorize municipalities to embark in the business of constructing railroads, on their own sole account, as local improvements. The railway contemplated in this instance, is several hundred miles in length, extending into other States ; the sum authorized to be expended in its construction is a large one, and should it prove inadequate for the completion of the road, we may reason ably expect it will be increased by subsequent legislation.
These considerations, and the apparent abuse of discre *41 tion involved in declaring such a work to be so far local in its character as to justify its construction by a single city, at the sole expense of its citizens, all give a high degree of interest to the question. But we must bear in mind, that the question is one of legislative power, and not of the wisdom, or even of the justice of the manner in which that power, if it exists, has been exercised. Had we jurisdiction to pass upon the latter question, we should probably have no hesitation in declaring the act under review to be an abuse of the taxing power.
Let us then first inquire, under what conditions it becomes •competent for the judiciary to declare an attempted act of legislation, formally enacted by the general assembly, to be invalid, by reason of unconstitutionality.
Courts cannot, in our judgment, nullify an act of legislation, on the vague ground that they think it opposed to a general “ latent spirit,” supposed to pervade or underlie the constitution, but which neither its terms nor its implications clearly disclose in any of its parts. To do so would be to arrogate the power of making the constitution what the court may think it ought to be, instead of simply declaring what it is. The exercise of such a power would make the court sovereign over both constitution and people, and convert the government into a judicial despotism. Whilst we declare that legislative power can only be exercised within the limits prescribed by the constitution, we are equally bound to keep within the sphere allotted to us by the same instrument. On this subject we cannot do better than to adopt what is so well said by Judge Cooley, in his treatise on “ Constitutional Limitations,” pp. 128, 129, where, in speaking of limitations upon legislative authority, he says: “Some of these are prescribed by constitutions, but others spring from the very nature of free government. The latter must depend for their enforcement upon legislative wisdom, discretion,, and conscience. The legislature is to make laws for the public good and not for the benefit of individuals. It has control of the public moneys, and should provide for disbursing them for public purposes only. Taxes should *42 only be levied for those purposes which properly constitute a public burden. But what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which cannot be controlled by the courts, except perhaps where its action is clearly evasive, and where, under pretense of a lawful authority, it has assumed to exercise one that is unlawful. Where the power which is exercised is legialative in its character, the courts can enforce only those limitations which the constitution imposes, and not those implied, restrictions, which, resting in theory only, the people have been satisfied, to leave to the judgment, patriotism, and sense of justice of their representatives." And he adds on page 171: “Nor are the courts at liberty to declare an act void because, in their opinion, it is opposed to a spirit supposed to pervade the constitution but not expressed in words; ”■— citing People v. Fisher, 24 Wend. 220; Cochran v. Van Surlay, 20 Wend. 381; People v. Gallagher, 4 Mich. 244 ; Benson v. Mayor of Albany, 24 Barb. 252; Grant v. Courter, 24 Barb. 232; Wynehamer v. People, 13 N. Y. 391.
We do not understand it to be claimed that the act in question is an assumption of any of the powers specially delegated to the general government, by the constitution of the United States ; nor that , it is an encroachment upon the functions and powers conferred by the state constitution on other departments of the government, and therefore impliedly withheld from the general assembly. The only questions, therefore, with which we have to deal, are: 1st. Whether the act is within the general grant of legislative power which the constitution decía,res to be vested in the general assembly; and, 2nd. Does it contravene any of the limitations upon, the exercise of legislative power, which are either expressed or clearly implied in any of the provisions of that instrument. And before we can answer the former question in the negative, or the latter in the affimative, our convictions must be clear and free from doubt. Lehman v. McBride, *43 15 Ohio St. 291; C. W. & Z. R. B. Co. v. Com. of Clinton Co. 1 Ohio St. 77, and authorities there cited.
Let us then consider, first, whether this act is within the general scope of legislative power, independent of special constitutional prohibition.
That it is within the legitimate scope of legislative power to authorize a municipality of the State to aid in the construction of a public improvement such as a rail road, by becoming a stockholder in a corporation created for that purpose, and to levy taxes to pay the subscription, must be regarded as fully settled in this State by repeated adjudication. -In the case of C. W. & Z. R. R. Co. v. Com. of Clinton County, 1 Ohio St. 77, the subject was very fully considered; and it was held, that as the State may itself construct roads, canals, and other descriptions of internal improvement, so it may employ any lawful means and agencies for that purpose, among which are private companies incorporated for the construction of such improvements. And it was said that, for much stronger reasons, counties might be authorized to construct works of a similar kind, of a local character, having a special relation to their business and interests. And as the State might construct or authorize the counties to construct these works entire, or create corporations to do it entire, it was held that, as a question of power, each might be authorized to do a part.
The validity of subscriptions to the stock of railroad corporations, made by counties, cities, towns, and townships of the State, under special legislative authority, has been drawn in question in many cases which have since come before this court, and in none of them has the authority of the legislature to grant such power of subscription been doubted. 1 Ohio St. 105; Id. 153 ; 2 Ohio St. 607 ; Id. 647 ; 6 Ohio St. 280; 7 Ohio St. 327 ; 8 Ohio St. 394; Id. 564; 11 Ohio St. 183 ; 12 Ohio St. 596 ; Id. 624; 14 Ohio St. 260 ; Id. 472 ; Id. 569.
And the cases in which such legislative authority has been upheld by the courts of last resort in other states are too numerous even for reference. A list of more than fifty of *44 such, cases may be found in Judge Cooley’s treatise before referred to, p. 119, note 4.
If w.e even admit that all these decisions have been unwise, yet it is clearly too late to overrule them in this State. Were the question a new one, and properly determinable by the judgment of a court, we should perhaps concur in opinion with Judge Eedfield, that subscriptions for railway stock, by cities and towns, do not come appropriately within the range of municipal powers and duties. Yet he is constrained .to add, that “ the weight of authority is all in one direction, .and it is now too late to bring the matter into serious debate.” 2 Redf. on Railways, 398, 399, note. And if, in the absence of constitutional prohibition, a municipal corporation may be authorized to aid, by stock subscriptions, in the construction ■of a railway which has a special relation to its business and interests,' upon what principle shall we deny that it can be .authorized to construct it entirely at its own expense, when its relation is such as to render it essential to the business interests of the municipality ? And upon the question of fact whether a particular road is thus essential to the inter<ests of the city, this court in the case of the C. W. & Z. R. R. already referred to, quote approvingly from the case of Goodin v. Crump, 8 Leigh R. 120, in which it was said : “ If then the test of the corporate character of the act is the probable benefit of it to the community within the corporation, who is the proper judge whether a proposed mea.sure is likely to conduce to the public interest of the city ? Is it this court, whose avocations little fit it for such inquiries ? Or is it the mass of the people themselves — the majority of the corporation, acting (as they must do if they act .at all) under the sanction of the legislative body ? The latter assuredly.” And in Sharpless v. Mayor of Philadelphia, 21 Penn. St. R. 147, it was said byC. J. Black, “If the legislature may create a debt and lay taxes on the whole people to pay such subscriptions, may they not with more justice, and greater propriety, and with as clear a constitutional right allow a particular portion of the people to tax themselves, to promote in a similar manner a public work in which they have *45 a special interest ? I think this question cannot be answered-in the negative.”.....“I cannot conceive of a. reason for doubting that what the State may do in aid of a work of general utility, may be done by a county or a city, for a similar work, which is especially useful to such county or city, provided the State refuses to do it herself, and permits it to be done by the local authorities.” The question in that case was upon the validity of subscriptions of stock made by the city of Philadelphia in aid of two railroads. One of these was the Hempfield road, which had its eastern terminus at Greensburg, three hundred and forty six miles west of Philadelphia. Both subscriptions were sustained,, and the court said, “It is the interest of the city which determines the right to tax her people. That interest does not necessarily depend on the mere location of the road.” . . . . “But it is not our business to determine what amount of interest Philadelphia has in either of these improvements. That has been settled by her own officers and by the-legislature. Eor us it is enough to know that the city may-have a public interest in them, and that there is not a palpable and clear absence of all possible interest perceptible by every mind at the first blush. All beyond that is a question of expediency not of law, much less of constitutional law.”
By the act under consideration, no railroads are authorized to be constructed, except such as have one of their termini in the city which constructs them. And that a city has no peculiar corporate interest in such channels of commerce as lead directly into it, is a proposition which, to say the least, is very far from being clearly true. And as the public or corporate interest in an improvement, rather than-its particuliar location, determines the question as to the-right of taxation for its construction, the fact that the road contemplated in the present case will lie mainly outside of this State, can make no difference. The right of eminent domain cannot be exercised, nor the road constructed in or through other States, without their permission and authority; and the act in question contemplates nothing of the kind» But when such consent is given, we suppose the particular *46 direction given to the road can have no bearing on the question of corporate power to construct it.
It is also to be borne in mind, that this is not a case in which the legislature has determined a particular public improvement to be of a local character, and has imposed the burden of its construction on an unwilling municipality. But it is the case of an authority given to a city to exercise its powers of taxation only for the construction of an improvement which the local authorities have declared to be essential to the interest of the city, and even that cannot be done till a majority of its people have sanctioned the measure by their deliberate votes.
The towns and cities of the State are not the creations of the constitution. It recognizes these municipalities as existing organizations, properly invested by immemorial usage with powers of assessment and taxation for local purposes of a public character, but which were nevertheless subject to control and regulation by the-State, and that these powers might be abused unless properly restricted. The constitution itself provides where the power of preventing such abuse shall be vested. It declares, in article 13, sec. 6, that “the general assembly shall provide for the organization of cities and incorporated villages, by general laws, and restrict their power of taxation,' assessment, borrowing money, contracting debts, and loaning their credit so as to prevent the abuse of such power.” It is very clear, that this constitutional mandate cannot be enforced according to judicial discretion and judgment. In the very nature of the case, the power which is to impose restrictions so as to prevent abuse, must determine what is an abuse,. and what restrictions are necessary and proper. As is said by the learned author from whose treatise we have before quoted: “The moment a court ventures to substitute its own judgment for that of the legislature, in any case where the constitution has vested the legistature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference. *47 The rule of law upon this subject appears tobe, that except where the constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision, which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts can not assume their rights.” Cooley’s Const. Lim. 167,168
We do not moan to say that every legislative enactment is necessarily valid unless it conflict with some express provision of the constitution. Undoubtedly, the general assembly cannot divest A. of his title to property and give it to B. They cannot exercise judicial functions. They can impose taxes only for a public purpose. For it is of the essence of a tax that it be for a public use. Nor can they by way of taxation impose a burden upon a portion of the State only, for a purpose in which that portion of the State has no possible peculiar local interest. But to justify the interference of a court upon any of these grounds, the case must be brought clearly, and beyond doubt, within the category claimed; and such we are persuaded is not the cast in respect to the act in question.
We have been referred to recent adjudications in several States, which are supposed to sustain the claim that taxation cannot be authorized for the construction of a railroad in cases like the present. In the case of Whiting v. Sheboygan Railway Co. 9 American Law Reg. 156, it was held that “a statute levying a tax for the sole purpose of making a direct gift of the money raised to a mere private railway in which the State or the tax payers have no ownership, is unconstitutional,” The case, from Michigan, of The People ex rel. The Detroit and Howell R. R. Co. vs. Township of Salem, proceeds upon the same grounds. But in the case *48 now before us, the road is the property of the tax payers who furnished the means to build it. The recent decisions in Iowa, are in conflict with the former uniform line of decisions on the subject in the same State, and in all the cases referred to in either of those States, the reasoning upon which the decisions rest, is in conflict with what we cannot but regard as the settled law of this State.
We are brought to the conclusion that there is nothing in the general purport and main object of this act, which places it outside of the sphere of legitimate legislative power.
We proceed to consider whether it is in conflict with any of the express limitations imposed by the constitution.
It is claimed that the general assembly, in the act in question, by authorizing the judges of the superior court to appoint trustees of the contemplated railway, have exercised an appointing power, which is forbidden by the 27th section of the 2nd article of the constitution. The argument is, that the trustees whom the act authorizes the court to appoint ar& public officers ; that their appointment is not the exercise of a judicial function, or of any power that can be conferred on the judges of the court as such ; and that the-conferring of this power of appointment is the creation of a new and independent office, which cannot be filled by the appointment of the legislature, whether the appointee be designated by name, or by reference to another office which he holds. In the same connection it is claimed that this-power of appointment is conferred on the judges of the' superior court in violation of art. 4, sec. 14, of the constitution, which prohibits the judges of the Supreme Court and the court of common pleas from holding any other office of profit or trust under the authority of this State or the United States. And it is further argued that the act is in conflict with art. 2, sec. 20, of the constitution, because it does not fix the term of office and compensation of the trustees. Are any of these positions clearly well taken?
We shall first inquire whether the power of appointment-conferred by this act on the judges of the superior court involves the exercise of an appointing power by the general *49 assembly. Were the judges thereby appointed to a public office? In support of the affirmative of this question we are referred to the decision of this court in the case of The State on relation of The Attorney General v. Kennon et al. 7 Ohio St. R. 546. In that case it was held that the selection and designation by name of the defendants, by the general assembly, to exercise continuously, and as a part of the regular and permanent administration of the government, important public powers, trusts and duties, is an appointment to office. But we .think the present case can not be brought within the principle of that decision. In this case there is no designation of individuals by name to exercise any public functions whatever. It is clearly the case of an additional power or duty annexed to existing offices, and not the creation of a new office. Upon the filing of a petition by the city solicitor in the superior court, praying for the appointment of trustees, it is made the duty of the judges of that court to make such appointment, and to enter the same on the minutes of their court. The power of appointment and. of subsequent removal for unfaithfulness, can be exercised only by the court, as such ; and all power of control in the premises on the part of the judges ceases with the termination of their judicial offices. It is true that the act confers a new power on the judges of the superior court, but, as was said by Judge Swan, in his concurring opinion in the case referred to, “if adding to the duties or powers of existing offices is an exercise of the appointing power, then every new duty required or power conferred upon any State, county, or township officer, must be deemed the exercise by the general assembly of the appointing power, and forbidden by the constitution.”
But it is said that the appointment o'f these trustees is not the exercise of a judicial function. Suppose this to be so. Does it follow that no functions except such as are purely judicial can be constitutionally annexed to the office of a judge ? Can judges not be made conservators of the peace, and, as such, be required to discharge duties which are not of a judicial character ? If no power of appoint *50 ment to any office or position of public trust can' be devolved upon a court or judge, it is certain that many of the statutes of this State are invalid. Quite a number of statutes have been referred to by counsel, in which such power of appointment is given to probate judges, judges of the court of common pleas, and judges of the. superior court.
But is it clear that the selection and appointment of these trustees, which the act requires to be made by the judges of the superior court, and to be entered on the minutes of the court, is in no sense a judicial act ? It is the act of a court, and the selection of the trustees and the fixing of the amount of their bonds require the exercise of judgment and discretion. Authorities are not wanting to show that such an act is properly judicial in its character. Thus, where a statute of New York authorized a town to issue bonds to aid in the construction of a railroad, and made it the duty of the county judge to appoint, under his hand and seal, three commissioners to carry into effect the purposes of the act, it was held by the supreme court of that State that the act of making such appointment was judicial. It was said by the court: “ The action sought from the county judge is judicial. It is conferred by the statute upon the office of county judge, to be exercised under its seal. The duty requires the exercise of judgment and discretion in the selection of commissioners. The individual is in no way responsible for any acts of those he may select in the discharge of their duties. In no sense is the act of selecting commissioners ministerial. They do not act on the command of the county judge; he issues no process to them. If, after appointment, the persons designated accept and act, they do so under and by virtue of the statute, and not in virtue of the order designating them as commissioners.” Sweet v. Hulbert, 51 Barb. S. C. Rep. 315.
Nor do we think that these trustees are officers within the meaning of that clause of the constitution which provides ■that “The general assembly, in cases not provided for in this constitution, shall fix the term of office, and the compensation of all officers.” This clause cannot be regarded *51 as comprehending more than such offices as may be created to aid in the permanent administration of the government It cannot include all the agencies which the general assem bly may authorize municipal and other corporations to employ for local and temporary purposes. These trustees have no connection with the government of the State, or of any of its subdivisions. They have nothing to do with the general protection and security of persons or property. Their sole duty is to procure and superintend the construction of a particular road, and to lease it when constructed. When this shall have been done, so far as appears from the act, their functions end; and in the road, when constructed, the State will have no proprietary interest. All the railroads of the State, though owned and operated by private corporations, are, in an important sense, public improvements ; yet the officers who manage them, and superintend their pecuniary interests, are not public officers within the meaning of this constitutional provision. No one supposes that the compensation of such officers must be fixed by the legislature.
It remains to consider, with reference to the general purpose and object of the act, whether there are in the constitution special limitations on the general legislative power vested in the general assembly, which prohibit the authorizing of a city to raise, by taxation of its citizens, the means for constructing a railroad leading into such city, when such an improvement is deemed by a majority of the citizens to be essential to its interests. It is claimed that the grant of such authority is in violation of article 8, sec. 6, of the constitution, which reads as follows : “The general assembly shall never authorize any county, city, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever ; or to raise money for, or loan its credit to or in aid of, any such company, corporation, or association.”
It is proper to consider this section in connection with the sections which precede it in the same article, and with *52 some provisions found in other articles which bear more or less directly upon the same and kindred subjects.
The first two sections of this article enumerate the purposes for which the State may contract debts, and the third section declares that, except the debts thus specified, “no debt whatever shall hereafter be created by or on behalf of the State.” The fourth section declares that, “The credit of the State shall not, in any manner, be given or loaned to, or in aid of, any individual, association, or corporation whatever ; nor shall the State ever hereafter become a joint ■ owner or stockholder in any company or association, in this State or elsewhere, formed for any purpose whatever.” The fifth section forbids the assumption by the State of the debts of any county, city, town, or township, or of any corporation whatever, unless such debts shall have been created to repel invasion, suppress insurrection, or defend the State in war. In article 12, sec. 6, it is declared, “the State shall never contract any debt for purposes of internal improvement.” And article 13, sec. 6, provides as follows : “ The general assembly shall provide for the organization of cities and incorporated villages by general laws, and restrict their powers of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power.”
In Cass v. Dillon, 2 Ohio St. Rep. 613, 614, it was held, and we think properly, that the limitations imposed upon the State by the first three sections of art. 8, were not intended as limitations upon her political subdivisions — her counties and townships. And the clear implications of the fifth section are, that counties, cities, towns, and townships may create debts to repel invasion, suppress insurrection, or defend the State in war, which the State may assume ; and may also create debts for other purposes, which the State is forbidden to assume. By the fourth section a limitation is imposed in respect to the State, similar to that prescribed in the sixth section, in regard to counties, cities, towns, and townships. The State, and her municipalities and subdivisions are clearly distinguished, and treated of separately. *53 It is to the latter that the inhibitions of the sixth section relate. What are the extent and purport of those inhibitions ? Its own language must furnish the answer to this question, if that language be plain and unambiguous. Of course, I do not mean that we are bound to adhere strictly to the letter, without regard to the evident meaning and spirit of the instrument. The fundamental law of the State is to be construed in no such narrow and illiberal spirit. On the contrary, it is to be construed according to its intention, where that is clear; and that which clearly falls within the reason of the.prohibition may be regarded as embodied in it. Still, it is very clear that we have no power to amend the constitution, under the color of construction, by interpolating provisions not suggested by the language of any part of it. We cannot supply all omissions, which we may believe have arisen from inadvertence on the part of the constitutional convention. Recurring then to the language of this section, it is quite evident, that it was not intended to prohibit the construction of railroads; nor, indeed, to prohibit any species of public improvements.
The section contains no direct reference to railroads, nor to any other special classes of improvements or enterprises. Its inhibitions are directed only against a particular manner or means by which, under the constitution of 1802, many public improvements had been accomplished. And its language is sufficiently comprehensive to embrace every enter-prize involving the expenditure of money, and the creation of pecuniary liabilities. Under the constitution of 1802, numerous special acts of legislation had authorized counties, cities, towns, and townships, to become stockholders in private corporations, organized for the construction of railroads, to be owned and operated by such corporations. The stock thus subscribed by the local authorities was generally authorized to be paid for by the issue of bonds, which were to be paid by taxes assessed upon the property of their constituent bodies. Many of these enterpises proved unprofitable, and the stock became valueless. Some of them wholly failed. Heavy taxation followed to meet and dis *54 charge the interest and principal of the bonds thus issued. Towns and townships were induced to attempt repudiation of their contracts. And, as the records of this court abundantly show, the assessment and collection of the taxes, which the preservation of good faith required, had repeatedly to be enforced by mandamus. In many, if not all of these cases, it was alleged that the stock subscriptions sought to be enforced had been voted for and made under the influence of false and fraudulent representations made by interested officers and agents of the corporation to be aided by the subscription. At the time of the formation and adoption of the present constitution these evils had begun to be seriously felt, and excited the gravest apprehensions of calamitous results. Under such circumstances this section was made a part of the State constitution. It may be well again to recur to its language : “ The general assembly shall never authorize any county, city, town, or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation, or association whatever ; or raise money for, or loan its credit to, or in aid of any such company, corporation, or association.” The mischief which this section interdicts is a business partnership between a municipality or subdivision of the State, and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever. In no project originated by individuals, whether associated or otherwise, with a view to gain, are the municipal bodies named permitted to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders nor furnish money or credit for the benefit of the parties interested therein. Though joint stock companies, corporations and associations only are named, we do not doubt that the reason of the prohibition would render it applicable to the case of a single individual. The evil would be the same, whether the public suffered from the cupidity of a single person, or from that of several persons associated together.
As this alliance between public and private interests is *55 clearly prohibited in respect to all enterprises, of whatever kind, if we hold that these municipal bodies cannot do on their own' account what they are forbidden to do on the joint account of themselves and private partners, it follows that they are powerless to make any improvement, however necessary, with their own means, and on their own sole account. We may be very sure that a purpose so unreasonable was never entertained by the framers of the constitution.
Besides, if this section is to be construed so as to prohibit municipal corporations from making improvements on their own account, and with their own means, then the fourth section of this same article, which is quite similar in language, must be held to prohibit the making of any improvements by the State, on her own account, and with her own means. This would not only be highly unreasonable, but would conflict with the clear implications of the section which prohibits the State from contracting any debt for purposes of internal improvement. This implies that the State may make all such improvements as will not involve the creation of a debt.
We find ourselves unable therefore, upon any established rules of construction, to find in this section the inhibition claimed by counsel to arise by implication. It may be, and indeed I think it very probable, that had the framers of the constitution contemplated the possibility óf a grant to a municipal corporation of such powers as the acts under consideration confer, they would have interposed farther limitations upon legislative discretion. But omissions of such a grave character surely cannot be supplied according to the conjectures of a court.
It is argued, however, that the trustees of the contemplated railway are a corporation, and that the act in question violates the terms of this section, by authorizing the city to raise money for and loan its credit to this corporation, to enable it to construct a railroad. We think it unnecessary to inquire whether the trustees provided for by the act are in any sense a corporation or not. Eor if they are an association or organization of any kind whatever, having a prop *56 erty interest in the road distinct from that of the city, then the objection is well taken. The inhibitions of this section are not directed against names. But it is clear that the trustees are a mere agency through which the city is authorized to operate for its own sole benefit. Neither as individuals, nor as a board have they any beneficial interest in the fund which they are to manage, or in the road which they are to build. They are in fact, as well as in name, but trustees, and the sole beneficiary of the trust is the city of Cincinnati. They are authorized to act only in the name and on behalf of the city. Looking therefore to the substance of things, this case cannot be brought within the terms of the prohibition, unless we are to regard the city itself as being one of the corporations for which money is not to be raised, nor a loan of credit made.
We do not understand counsel as relying upon any other ground of objection to the validity of this act than those which we have considered, and are of-opinion that the judgment of the court below must be affirmed.
Welch, White, Day and McIlvaine, JJ., concurred.